UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Case No. 20-cr-147 (PAM/LIB)

        Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Augustus Quintrell Light,

        Defendant.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Augustus Quintrell Light's (hereinafter "Defendant") various Motions. [Docket Nos. 31, 32, 33, 55, 58, 59, 60, 61, 62, 63, 64, 65, 69]. The Court held a Motions Hearing on October 19, 2020, regarding the Defendant's pretrial motions.[1]

At the motions hearing, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant's Motions, [Docket Nos. 31, 32, 33, 55, 58, 59, 60, 61, 62, 63, 64, 65, 69], were taken under advisement.

For reasons discussed herein, the undersigned recommends that Defendant's Motions to Suppress DNA Evidence, [Docket No. 31], be **DENIED**; that Defendant's Motions to Suppress Electronic Surveillance Evidence, [Docket No. 32, 55, 58, 61, 63], be **DENIED**; that Defendant's Motion to Suppress Physical Evidence, [Docket No. 33, 62, 64], be **DENIED**; and that Defendant's Motions to Dismiss Indictment, [Docket No. 59, 60, 65, 69], be **DENIED**.

**I.     Background and Statement of Facts**

     **A.  Background**

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 78].

In the present case, Defendant is charged with one (1) count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); one (1) count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and one (1) count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). (Indictment [Docket No. 1]).

Immediately after the present Indictment was filed against Defendant in the present action, Defendant was appointed legal counsel of record to represent him in the present action. (See, Order [Docket No. 6]). Defendant subsequently moved to represent himself pro se in the present action, and Defendant was ultimately permitted to proceed pro se in the present action. (Order [Docket No. 46]). Defendant continues to proceed pro se.

**B.  Facts**[2]

The record presently before the Court indicates that on November 12, 2019, a concerned citizen whose identity was known to law enforcement approached Special Agent Dave Hart (hereinafter "SA Hart") of the Beltrami County Sherriff's Office to report "suspected drug activity." (Gov't's Ex. 3).[3] The concerned citizen reported that a specific residence in Bemidji, Minnesota, had increased "short term traffic" since new tenants had moved into the residence in the summer of 2018. (Id.). The concerned citizen further reported that the traffic was "constantly coming and going," and the vehicles would "usually stay for 10 minutes or less and often passengers will stay in the vehicles." (Id.).

SA Hart began investigating the report, and he learned that the provided address was associated with Kelvin Donelle Farrow who was then on Minnesota state probation for fifth

---

[2] The facts contained in this section are derived from the parties' exhibits presented in the present case.

[3] Government's Exhibit 3 is the December 6, 2019, warrant application, supporting affidavit, and warrant to search an identified residence in Naytahwaush, Minnesota, as well as, an identified vehicle at that residence. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 3.

degree possession of a controlled substance and who then had an active warrant for his arrest. (Id.). On November 12, 2019, SA Hart located the residence (hereinafter the "Farrow residence") where he observed a 2004 white Lincoln Town Car which was registered to Defendant. (Id.). SA Hart learned that Defendant was then on federal probation with the United States Department of Justice for illegal possession of firearms. (Id.). SA Hart also learned that Defendant's criminal history included convictions for charges involving controlled substances. (Id.).

During his investigation, SA Hart spoke with a "Paul Bunyan Task Force Confidential Reliable informant" (hereinafter "Confidential Informant 1") who identified Defendant "as a distributor of methamphetamine and heroin in the Beltrami County Area." (Gov't's Ex. 2).[4] Confidential Informant 1 reported that they[5] had purchased both methamphetamine and heroin from Defendant on multiple occasions, and they had observed Defendant in possession of certain quantities of controlled substances. (Id.). Confidential Informant 1 also reported that they contacted Defendant at 218-401-2024 "to arrange controlled substances transactions." (Id.).

SA Hart also spoke with an individual he referred to as a "Cooperating Defendant" (hereafter "Cooperating Defendant 1")[6] who informed SA Hart that Defendant was "their supplier of methamphetamine in the Beltrami County Area." (Id.). Defendant was known to have "a source of methamphetamine and heroin in the MSP areas and make[] weekly trips to obtain large quantities of the controlled substances for further distribution in the northern Minnesota

---

[4] Government's Exhibit 2 is the November 27, 2019, warrant application, supporting affidavit, and warrant authorizing the installation and use of "a pen register, trap and trace device" on a telephone number associate with Defendant. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 2.

[5] Presumably to preserve anonymity, the affidavits submitted in support of the various search warrants in the present case do not identify the gender of the confidential informants or the person identified as a "cooperating defendant." (See, Id.). The affidavits use the gender-neutral term "they" to refer to each of these persons. (See, Id.). For purposes of the present Report and Recommendation, the Court will use this same term to refer to the confidential persons discussed in this Report and Recommendation.

[6] Although this person is referred to as a cooperating defendant, there is only one defendant in the present case: Defendant Augustus Quintrell Light.

area." (Id.). Cooperating Defendant 1 also reported that he contacted Defendant at 218-401-2024 telephone number "to arrange controlled substances transactions." (Id.).[7]

On November 27, 2019, SA Hart submitted a state court application for an "Order and Tracking Warrant authorizing the installation and use of: **a pen register, trap and trace device including caller identification, electronic tracking device, and/or cellular tower location and service information, including services such as Global Positioning System (GPS) technology, precision location related technologies, and/or a tracking warrant** on telephone number **218-401-2024**." (Id.) (emphasis in original). SA Hart also submitted an affidavit in support of this application. (Id.).

In his affidavit submitted in support of the application for the November 27, 2019, Tracking Warrant, SA Hart provided the details of the investigation, as described above except for his initial interaction with the concerned citizen, and he attested that based on his training and experience he knew "individuals involved in the distribution of controlled substances often use their cell phones to arrange narcotics transactions," and "cellular phones capture location information" which "can be fruitful in investigations regarding controlled substances, as it shows where the individual has recently been, and where these individuals frequent." (Id.). He further provided that "obtaining cellular phone data assists law enforcement with surveillance efforts on subjects involved in the controlled substance trafficking investigation." (Id.).

Regarding Confidential Informant 1, SA Hart attested that Confidential Informant 1 had "provided true and accurate information in the past that ha[d] been independently corroborated by law enforcement to include, names, cell phone numbers, locations, vehicles and methods of

---

[7] SA Hart noted that he had reviewed Cooperating Defendant's criminal history; however, he failed to include that criminal history in his affidavit. (Id.) (providing that he had reviewed the "criminal history and observed ….." ) (ellipses in original). In a later, separate application for a search warrant it was noted that Cooperating Defendant 1 had "one prior conviction for a crime of deception over ten (10) years ago," but that SA Hart "fe[lt] listing the literal offense could jeopardize the confidentiality of the" Cooperating Defendant. (Gov't's Ex. 3).

operating of individuals involved in controlled substance crimes." (Id.). SA Hart also noted that Confidential Informant 1 was working with law enforcement "for possible consideration on a criminal offense." (Id.). SA Hart further attested that Confidential Informant 1 had previously "provided information leading to the execution of search warrants where controlled substances have been seized," as well as, "led to the arrest [of] individuals for controlled substance crimes." (Id.). SA Hart also attested that he had reviewed the criminal history of Confidential Informant 1 observing "no previous convictions for crimes of deception." (Id.).

Regarding Cooperating Defendant 1, SA Hart attested that Cooperating Defendant 1 had "provided a statement against their own penal interest." (Id.). SA Hart noted that Cooperating Defendant 1 provided information "for possible consideration on a criminal offense." (Id.). SA Hart attested that Cooperating Defendant 1 had provided information involving "individuals suspected of being involved in controlled substances crimes that was independently corroborated by [SA Hart] during [his] investigation." (Id.).

SA Hart further attested that based on his investigation, he believed the 218-401-2024 telephone number was being used by Defendant to conduct controlled substance trafficking and sales with individuals in the Beltrami County area. (Id.).

The Honorable John G. Melbye, District Court Judge for the State of Minnesota, Ninth Judicial District, County of Beltrami, issued a "Findings, Order, and Tracking Warrant" authorizing the request contained in SA Hart's application. (Id.).[8] Specifically, Judge Melbye determined "that probable causes exist[ed] that a crime has been, is being, or is about to be committed by the person in possession of the electronic device" subject to the Tracking Warrant. (Id.). Thereafter, law enforcement officers executed the November 27, 2019, Tracking Warrant.

---

[8] The signature of Judge Melbye is not entirely legible in the November 27, 2019, Warrant; however, other documents on the record now before the Court indicate that it was Judge Melbye who signed the November 27, 2019, Warrant.

Through the use of the Tracking Warrant, law enforcement received information indicating that on November 29, 2019, Defendant "appeared to leave the City of Bemidji to travel to the [Minneapolis/St. Paul] area," and over the next forty-eight hours he "appeared to travel to several high drug activity (HAD) areas in north and south Minneapolis," including areas with which SA Hart was familiar "based on previous investigations in to [sic] the distribution of both heroin and methamphetamine." (Gov't's Ex. 3). Law enforcement conducted "multiple controlled purchases of heroin in the area [Defendant] travelled to." (Id.).

On December 1, 2019, Defendant began to return to Fridley, Minnesota. (Id.). During his drive there, law enforcement officers conduct a traffic stop of the vehicle in which Defendant was located based on the expired vehicle registration. (Id.). Law enforcement officers obtained consent to search the vehicle; there were no controlled substances discovered. (Id.). Defendant "refused a consent to search of his person." (Id.).

Thereafter, the physical and electronic surveillance of Defendant indicated that "[a]pproximately every 24 hours" Defendant appeared "to travel from his residence in Naytahwaush, MN to Bemidji." (Id.). Defendant remained in Bemidji, Minnesota for approximately twelve hours making "several trips between the areas of [the Farrow residence] and" a residence located at "XXX Wood Avenue SE," referred to as the Skinaway residence (Id.).

On December 3, 2019, law enforcement officers observed a "GMC Sierra" registered to Defendant at Defendant's residence in Naytahwaush, Minnesota (hereinafter "Defendant's Naytahwaush residence"). Electronic surveillance information also indicated that Defendant was at his Naytahwaush residence at the same time as the GMC Sierra, and law enforcement's review

of "Minnesota DMV records" also indicated that the Naytahwaush residence was Defendant's residence. (Id.).

On December 6, 2019, SA Hart spoke with a second confidential informant (hereinafter "Confidential Informant 2") who reported that in the previous two weeks they[9] had observed "a large amount of currency at [Defendant's] Naytahwaush residence . . . ." (Id.). SA Hart provided Confidential Informant 2 with a photograph of Defendant's Naytahwaush residence, and Confidential Informant 2 confirmed that it was the residence at which they had observed the currency. (Id.). Confidential Informant 2 also reported seeing Defendant and another associate at the Farrow residence with an amount of methamphetamine which SA Hart knew to be "commonly associated with the sale of controlled substances, rather than personal use." (Id.).

On December 6, 2019, White Earth Police Department Officer Kristopher Larson, who was then assigned as a Special Agent with the Paul Bunyan Drug Task Force and the Headwaters Safe Trails Task Force (hereinafter "SA Larson"), submitted a state court application for a search warrant authorizing law enforcement to search Defendant's Naytahwaush residence, as well as, the 2011 GMS Sierra located at said residence. (Gov't's Ex. 3). This December 6, 2019, Search Warrant application sought to search for "[d]ocuments and materials commonly used, stored and maintained by traffickers of illegal drugs to include but not limited to . . . [w]ritten materials . . . and other papers relating to the transportation, ordering, possession, sale and distribution of illegal drugs and concealment and trafficking of currency" and United States currency. (Id.).

In his affidavit submitted in support of the application for the December 6, 2019, Search Warrant seeking authority to search Defendant's Naytahwaush residence, SA Larson provided the details of the investigation as described above. (Id.). SA Larson attested that SA Hart had corroborated the initial information provided by the concerned citizen through physical

---

[9] See, fn. 5.

surveillance of the Farrow residence which demonstrated that there was "short term vehicle and foot traffic" which SA Hart described as "highly indicative [of] the distribution of controlled substances under the totality of the investigation." (Id.). SA Larson further attested that in addition to the information discussed above, Cooperating Defendant 1 had also informed SA Hart that Defendant was known to have "a blue truck." (Id.).

Regarding Confidential Informant 2, SA Larson attested that Confidential Informant 2 had previously provided "true and accurate information" which had been independently verified by law enforcement. Confidential Informant 2 was working with law enforcement "for possible consideration on a criminal offense." (Id.). SA Larson further attested that Confidential Informant 2 had conducted "multiple purchases of methamphetamine and heroin under the direction and supervision of" law enforcement, and Confidential Informant 2 had previously provided law enforcement with information "leading to the execution of search warrants where controlled substances ha[d] been seized." (Id.). Confidential Informant 2 had also provided law enforcement with information which "led to the arrest of individuals for controlled substances crimes." (Id.). SA Larson also attested that SA Hart had reviewed Confidential Informant 2's criminal history which included "no previous conviction for crimes of deception." (Id.).

SA Larson further attested that on November 14, 2019, law enforcement officers had executed a search warrant on the Farrow residence in Bemidji, Minnesota "for controlled substance crimes." (Id.).[10] Defendant's white Lincoln Town Car was parked in the driveway of the Farrow residence at the time the search warrant was executed; however, Defendant was not located at the residence. Upon arriving at the residence, a male figure, who had begun exiting the residence, fled back into the residence, and he loudly informed other persons in the residence of the arrival of law enforcement. (Id.). He was later detained exiting the bathroom of the residence

---

[10] Defendant does not challenge this search warrant.

where SA Hart "observed the toilet water running" which he believed to indicate that the male had "destroyed evidence of controlled substance crimes by flushing it down the toilet." (Id.). Law enforcement detained three individuals and seized some controlled substances as a result of the execution of this search warrant. (Id.). One of these individuals reported that Defendant "had been at the residence all day," and the individual "appeared perplexed that [Defendant] was not at the residence." (Id.).

SA Larson's affidavit in support of the application for the December 6, 2019, Search Warrant also provided that SA Hart had been working with a third confidential informant (hereinafter "Confidential Informant 3"). (Id.). Confidential Informant 3 reported that Defendant was a "distributor of methamphetamine and heroin in the Beltrami County area," and they[11] contacted Defendant through the 218-401-2024 telephone number. (Id.). Confidential Informant 3 also reported that Defendant sold heroin from both the Farrow residence and the Skinaway residence. It was reported to SA Hart by Confidential Informant 3, however, that Defendant did not "seem[] concerned a search warrant was executed" at the Farrow residence because Defendant had "others conduct controlled substance sales for him." (Id.). Confidential Informant 3 reported to SA Hart that Defendant "drops the controlled substances off at" the Farrow residence and Skinaway residence "and then returns to collect the money." (Id.).

SA Hart directed Confidential Informant 3 to conduct a controlled purchase of methamphetamine from a known suspect at the Skinaway residence. Confidential Informant 3 conducted said controlled purchase in the seventy-two hours prior to the submission of SA Larson's application for the December 6, 2019, Search Warrant. During the controlled purchased the known suspect "spoke openly about distribut[ing] the heroin for" Defendant. (Id.).

---

[11] See, fn. 5.

Confidential Informant 3 was working with law enforcement for financial compensation; however, they had provided statements to law enforcement "against their own penal interest." (Id.). Confidential Informant 3 had provided law enforcement with information regarding the distribution of controlled substances in the Beltrami County area which had been independently verified by SA Hart. (Id.). Confidential Informant 3 had "conducted multiple controlled buys of controlled substances, including methamphetamine and heroin under the direction and supervision of SA Hart." (Id.). Confidential Informant 3's criminal history includes "a prior conviction of a crime of deception in 2015 for felony theft." (Id.).

SA Larson's affidavit further provided that law enforcement continued to conduct physical surveillance of both the Farrow residence and the Skinaway residence. (Id.). Defendant's blue GMC Sierra was observed at both residences. (Id.). SA Larson further attested that Defendant was then on federal probation "for the illegal possession of firearms," and Defendant's criminal history included convictions related to controlled substance crimes. (Id.).

SA Larson also attested that law enforcement had continued to conduct physical and electronic surveillance of Defendant. (Id.). Between December 1, 2019, and December 6, 2019, it was observed that Defendant "appear[ed] to travel from his" Naytahwaush residence to Bemidji, Minnesota every twenty-four hours. (Id.). Physical and electronic surveillance had matched Defendant's "GMC Sierra locations in Naytahwaush, MN and the residences in Bemidji, MN." (Id.).

SA Larson further attested that based on the investigation he believed Defendant would be travelling to the Minneapolis and St. Paul, Minnesota areas in the days following December 6, 2019, "to obtain additional controlled substances for further distribution in the Bemidji," Minnesota area. (Id.). SA Larson explained that it was law enforcement's intent to

simultaneously execute three search warrants at the Farrow residence, the Skinaway residence, and Defendant's Naytahwaush residence. (Id.).

SA Larson further attested that based on the investigation he believed Defendant was using the 2011 GMC Sierra in conducting "controlled substances crimes." (Id.). Specifically, SA Larson believed Defendant "to be transporting controlled substances and/or proceeds from controlled substances sales between" the Farrow residence, the Skinaway residence, and his Naytahwaush residence. (Id.).

The Honorable Darlene Rivera-Spalla, District Court Judge for the State of Minnesota, Ninth Judicial District, County of Mahnomen, determined that probable cause existed to support the issuance of the December 6, 2019, Search Warrant authorizing law enforcement to search Defendant's Naytahwaush residence and the GMC Sierra located there. (Id.).

On December 7, 2019, law enforcement officers, including SA Larson, executed the December 6, 2019, Search Warrant upon Defendant's Naytahwaush residence. (Gov't Ex. 5).[12] During the execution of the December 6, 2019, Search Warrant, law enforcement officers located and opened a "safe" in which they observed "a large amount o[f] suspected heroin, currency, scales, pistol ammunition and a medical card for" Defendant. (Gov't Ex. 4).[13] Law enforcement officers immediately "stopped the search . . . ." (Id.). Law enforcement officers secured the Defendant's Naytahwaush residence while the search was halted. (Id.).

While Defendant's Naytahwaush residence was secure, SA Larson, as a precautionary measure, submitted a state court application for a search warrant authorizing law enforcement to

---

[12] Government's Exhibit 5 contains both the "Receipt, Inventory and Return" for the December 6, 2019, Search Warrant, and the "Receipt, Inventory and Return" for the December 7, 2019, Search Warrant. At the Motions Hearing, the Government, without objection, offered both documents into evidence as Government's Exhibit 5.

[13] Government's Exhibit 4 is the December 7, 2019, warrant application, supporting affidavit, and warrant authorizing law enforcement to search Defendant's Naytahwaush residence and the GMC Sierra. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 4.

search Defendant's Naytahwaush residence and the GMC Sierra located there for the items law enforcement had observed while executing the December 6, 2019, Search Warrant.[14] The December 7, 2019, Search Warrant application sought to search for "[c]ontrolled substances including, [sic] but not limited to heroin"; items associate with the distribution of heroin; firearms and ammunition; items or documents "showing off premises storage facilities"; "[a]ll money, precious metals, [and] precious stones found in close proximity to controlled substances"; and "[a]uthority to photograph the above-described items and their location within the premises." (Id.).

In his affidavit submitted in support of the application for the December 7, 2019, Search Warrant, SA Larson provided the details of the investigation as discussed above, including a discussion of the items which law enforcement officers had personally observed in Defendant's Naytahwaush residence. (Id.). SA Larson attested that he knew that Defendant was prohibited from possession of any firearm or ammunition. (Id.).

On December 7, 2019, Judge Rivera-Spalla determined that probable cause existed to support the issuance of the December 7, 2019, Search Warrant which permitted law enforcement to search for and seize the additional items during their search of Defendant's Naytahwaush residence. (Id.). Law enforcement officers then continued the search of Defendant's Naytahwaush residence and the GMC Sierra located there. (Gov't Ex. 5).

On December 7, 2019, law enforcement officers also executed a search warrant[15] on the Farrow residence. During the execution of this search warrant, law enforcement officers located approximately 3.6 grams of cocaine, 11.8 grams of heroin, and 68.8 grams of methamphetamine.

---

[14] These items were not specifically listed on the December 6, 2019, Search Warrant as items to be seized, and therefore, in an abundance of caution, SA Larson applied for the December 7, 2019, Search Warrant which specifically listed the items law enforcement had observed in the safe. (Id.).
[15] Defendant does not challenge this search warrant authorizing the search of the Farrow residence.

(Id.). The controlled substances and the packages in which they were contained were sent to the Minnesota Bureau of Criminal Apprehension. (Id.). Defendant was located inside the Farrow residence during the execution of the search warrant, and Defendant was subsequently arrested. (Id.).

On June 8, 2020, the Minnesota Bureau of Criminal Apprehension provided SA Hart with a forensic report which indicated that "a major male DNA profile was obtained from the drug packaging," and the DNA profile matched Defendant's "offender sample." (Id.). On June 9, 2020, the Minnesota Bureau of Criminal Apprehension provided SA Hart with another forensic report which indicated, "with a 95% confidence level" that the suspected controlled substances seized from the Farrow residence were in fact "cocaine, heroin, and methamphetamine." (Id.).

On June 9, 2020, SA Hart requested and received a search warrant authorizing law enforcement officers "to collect a known DNA sample from [Defendant] using a buccal swab to compare to the known major male DNA profile located on the drug packaging by the" Minnesota Bureau of Criminal Apprehension. (Id.).[16] On June 10, 2020, SA Hart met with Defendant at the Tri-County Community Corrections Center in Crookston, Minnesota, where Defendant was detained. (Id.). SA Hart presented the June 9, 2020, search warrant to Defendant; however, Defendant refused to comply with said search warrant. (Id.).

On June 10, 2020, SA Hart submitted a state court application for a search warrant authorizing law enforcement to search Defendant's jail cell for personal items containing a known DNA sample. (See, Gov't's Ex. 1).[17] In support of this application, SA Hart submitted an

---

[16] Defendant does not challenge this initial DNA Search Warrant.

[17] Government's Exhibit 1 is the June 10, 2020, warrant application, supporting affidavit, and warrant authorizing law enforcement to search Defendant's jail cell for personal items containing known DNA, as well as, the "Evidence Receipt" following the execution of that search warrant. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, warrant, and evidence receipt into evidence as Government's Exhibit 1.

affidavit in which he summarized the details of the investigation as described above, including Defendant refusal to comply with the June 9, 2020, search warrant. SA Hart attested that he knew "offender samples" were "not considered evidentiary samples," and therefore, law enforcement sought a "known sample" from Defendant for comparative testing by the Minnesota Bureau of Criminal Apprehension. (Id.).

SA Hart also attested that during his meeting with Defendant he observed Defendant drinking from a "clear mug style cup with a black lid" which SA Hart knew to be "purchased individually through the inmate canteen." (Id.). SA Hart also learned that Defendant was being housed in an individual cell. (Id.). SA Hart further attested that he knew that "inmates possess personal items while incarcerated such as toothbrushes, combs and cups that known DNA is transferred onto." (Id.). SA Hart noted that he knew that these items were commonly kept in an inmate's cell during the period of incarceration. (Id.).

On June 10, 2020, the Honorable Anne Rasmusson, District Court Judge for the State of Minnesota, Ninth Judicial District, County of Polk, determined that probable cause existed to support the issuance of the June 10, 2020, DNA Search Warrant. (Id.). Thereafter, SA Hart executed the June 10, 2020, DNA Search Warrant. (Id.).

## II.    Defendant's Motions to Dismiss the Indictment. [Docket No. 59, 60, 65, 69].

Defendant's Motions to Dismiss the Indictment each seek to dismiss the Indictment. (Def.'s Mots. [Docket Nos. 59, 60, 65, 69]). Defendant argues that the Indictment should be dismissed for a variety of reasons. (See, Id.).

In his first Motion to Dismiss, Defendant first argues that the prosecution of the present Indictment violates the Double Jeopardy Clause of the Fifth Amendment. (Def.'s Mot. [Docket No. 59]). In support of this argument, Defendant asserts that he was first charged in State Court

for his actions alleged in the present Indictment, that the prosecutor in the State Court failed to provide Defendant with all relevant discovery, that the State Court used the Federal Government as a "tool" in its prosecution, and he was indicted in the present case only days after the state court prosecutor admitted that he had not yet provided Defendant with all the relevant discovery. (See, Id.). Defendant's argument here is unpersuasive.

"The Double Jeopardy Clause of the Fifth Amendment . . . bars a second prosecution for the same offense or a lesser included offense." United States v. Bailey, 34 F.3d 683, 687 (8th Cir. 1994) abrogated in part by United States v. Gaudin, 515 U.S. 506 523 (1995). The Eighth Circuit Court of Appeals has consistently held that "[j]eopardy attaches to a prosecution when the jury is empaneled and sworn or, in a nonjury case, when the court begins to hear evidence." United States v. Lewis, 844 F.3d 1007, 1010 (8th Cir. 2017) (citations omitted). "Where the record clearly shows that jeopardy has not attached . . . , the defendant has failed to state a colorable double jeopardy claim." Lewis, 844 F.3d at 1010 (citing Bailey, 34 F.3d at 687). Double Jeopardy simply "does not come into play until a proceeding begins before a trier having jurisdiction to try the question of the guilt or innocence of the accused." Serfass v. United States, 402 U.S. 377, 391 (1975) (citation omitted). "Without risk of a determination of guilt, jeopardy does not attach, and neither an appeal nor further prosecution constitutes double jeopardy." Id. at 391–92.

In the present case, Defendant alleges that he was charged in State Court for crimes based on the same conduct underlying the present Indictment; however, Defendant does not allege that a jury was ever empaneled in that State Court case nor that he was even approaching trial in that State Court case. There is no indication in the record now before the Court that a jury was empaneled and sworn in Defendant's State Court case. In fact, in his Motion, [Docket No. 59],

Defendant specifically asserts that he had only participated in a pretrial omnibus motions hearing in his State Court case, and he was "Federally indicted days later." (Def.'s Mot. [Docket No. 59], at 3).

Because Defendant has failed to demonstrate that a jury was empaneled and sworn in his State Court case, jeopardy did not attach to his prosecution in State Court case. Serfass v. United States, 402 U.S. 377, 391 (1975); United States v. Lewis, 844 F.3d 1007, 1010 (8th Cir. 2017). Thus, the prosecution of the present case does not constitute double jeopardy. Serfass, 402 U.S. at 391–92.

Therefore, the undersigned recommends that Defendant's Motion to Dismiss the Indictment, [Docket No. 59], be **DENIED**.

In his second Motion to Dismiss the Indictment, [Docket No. 60], Defendant argues that the present Indictment should be dismissed because the Indictment is "insufficient." Specifically, Defendant asserts that an Indictment is required to set forth the essential elements of the offense charged, and he argues that that Indictment here fails to do so. (Id.).

"[T]o be valid, an indictment must allege that the defendant performed acts which, if proven, constitute the violation of law for which he is charged." United States v. Polychron, 841 F.2d 833, 834 (8th Cir. 1988). An indictment properly states an offense if:

> It contains all of the essential elements of the offense charges, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution. An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted.

United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008) (citations omitted). "An indictment is normally sufficient if its language tracks the statutory language." Id. (citing Hamling v. United States, 418 U.S. 87, 117 (1974)).

In the present case, Defendant is charged with one (1) count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); one (1) count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and one (1) count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). (Indictment [Docket No. 1]).

Count 1 of the Indictment charges Defendant with one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Specifically, in Count 1 of the Indictment, the Government alleges that "[o]n or about December 7, 2019" Defendant "did knowingly and intentionally possess with intent to distribute 50 grams or more of methamphetamine (actual), a controlled substance, all in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)."

Title 21 U.S.C. § 841 provides that "it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." 21 U.S.C. § 841(a)(1). Section 841(b)(1)(A) provides, in relevant part, the term of imprisonment to be imposed upon "any person who violates" 21 U.S.C. § 841(a) with "50 grams or more of methamphetamine . . . or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers . . . ." 21 U.S.C. § 841(b)(1)(A).

The language in Count 1 of the present Indictment tracks the statutory language of the offense charged. In doing so, Count 1 provides all of the essential elements of the offense charges; it fairly informs Defendant of the charges against which he must defend; and it provides sufficient information for him to plead a future, potential double jeopardy claim.

Count 1 of the Indictment is plainly sufficient.

Count 2 of the Indictment charges Defendant with possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C). In Count 2, the Government alleges that "[o]n or about December 7, 2019," Defendant "did knowingly and intentionally possess with intent to distribute a mixture and substance containing a detectable amount of heroin, and a mixture and substance containing a detectable amount of cocaine, both of which are controlled substances . . . ." (Indictment [Docket No. 1]).

The language in Count 2 of the present Indictment tracks the statutory language of the offense charged in Count 2. In tracking that statutory language, Count 2 thereby contains all of the essential elements of the offense charges. Likewise, the language in Count 2 fairly informs Defendant of the charges against which he must defend, and it provides sufficient information for him to plead a future, potential double jeopardy claim.

Count 2 of the Indictment is plainly sufficient.

Defendant argues that the language of Count 1 and Count 2 is insufficient because it lacks the "serious bodily injury" and "death" language from 21 U.S.C. § 841(b)(1)(C). Title 21 U.S.C. § 841(b)(1)(C) provides the varies possible penalties for violation of § 841(a) based on the type and quantity of the controlled substances involved. Each of these prescribed penalties provides that "if death or serious bodily injury results from the use of the" controlled substance involved in the violation, then the defendant is subject to an enhanced penalty. See, 21 U.S.C. § 841(b)(1)(C).

In the present Indictment, however, Defendant is not alleged to have caused "serious bodily injury" or "death" of another, and therefore, neither "serious bodily injury" nor "death" is an essential element of the offenses charged in the present Indictment. (See, Indictment [Docket No. 1]). Although Count 2 alleges that Defendant violated 21 U.S.C. § 841(b)(1)(C) because of

the type and quantity of the controlled substances allegedly involved in the offense charged, the Government does not allege that "death or serious bodily injury result[ed] from the use of" said controlled substance. (See, Indictment [Docket No. 1]). The Government is not required to include language regarding any provision of a statue with which it does not charge Defendant.

Therefore, the undersigned recommends that Defendant's Motion to Dismiss the Indictment, [Docket No. 60], be **DENIED**.[18]

In his third Motion to Dismiss the Indictment, [Docket No. 65], Defendant argues that the present Indictment must be dismissed because it is a "selective prosecution" in violation of his Equal Protection rights. In support of this argument, Defendant relies on the fact that the affidavits in support of the various Search Warrants above discussed Zach Sarmiento who law enforcement knew to be in possession of controlled substances, but who was not indicted in the present case. Defendant argues that this represents a violation of his Equal Protection rights because Mr. Sarmiento is "Caucasian" while Defendant is "African Amer[ican]." (Def.'s Mot. [Docket No. 65]).

To demonstrate a "selective prosecution, [a defendant] must show: (1) people similarly situated to him were not prosecuted; and (2) the decision to prosecute was motivated by a discriminatory purpose." United States v. Hirsch, 360 F.3d 860, 864 (8th Cir.2004) (citing United States v. Perry, 152 F.3d 900, 903 (8th Cir.1998)). The defendant "has the burden of proving the government engaged in selective prosecution." Id. (citing United States v. Kelley, 152 F.3d 881, 885 (8th Cir.1998)). "The 'evidentiary burden is a heavy one.'" United States v. Peterson, 652 F.3d 979, 981 (8th Cir.2011) (quoting United States v. Leathers, 354 F.3d 955, 961–62 (8th Cir.2004)).

---

[18] As observed above, Count 3 of the present Indictment charges Defendant with one (1) count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2); however, Defendant does not make any challenge to the sufficiency of Indictment relative to Count 3.

"In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" United States v. Armstrong, 517 U.S. 456, 465 (1996) (quoting United States v. Chemical Foundation, Inc., 272 U.S. 1, 14–15 (1926)). "Moreover, the evidence against the unprosecuted person must be 'as strong, or stronger, than that against the defendant.'" United States v. Schmitz, No. 16-cr-280 (SRN), 2019 WL 635413, at *5 (D. Minn. Feb. 14, 2019) (quoting United States v. Smith, 231 F.3d 800, 810–11 (11th Cir. 2000)).

On the record now before the Court, Defendant has failed to proffer any evidence that people similarly situated to him were not prosecuted or that the decision to prosecute him was motivated by a discriminatory purpose.

First, Defendant has failed to identify any similarly situated persons who were not prosecuted. "Defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." United States v. Heying, No. 14-cr-30 (JRT/SRN), 2014 WL 5286153, at *12 (D. Minn. Aug. 15, 2014), report and recommendation adopted, 2004 WL 5286155 (D. Minn. Oct. 15, 2014).

In the present case, Defendant points to Zach Sarmiento who is discussed in the affidavits submitted in support of the Search Warrants discussed above. Specifically, Defendant points to the fact that in the affidavits law enforcement acknowledged that Mr. Sarmiento was observed in the possession of an amount of heroin which law enforcement described as an amount associated with distribution rather than personal use; Mr. Sarmiento was detained during the execution of the same search warrant at which Defendant was detained; and SA Hart was aware that Mr.

20

Sarmiento's criminal history included a "felony conviction for Fifth degree possession of [a] controlled substance." (Def.'s Mot., [Docket No. 65], at 2).

On the record now before the Court, several factors might justify making different prosecutorial decisions with respect to Defendant as opposed to Mr. Sarmiento. Defendant's argument here completely ignores the fact that the record now before the Court is replete with reports that law enforcement officers conducted physical and electronic observation of Defendant travelling from the Bemidji area to the Minneapolis area, as well as, inside each of those areas; law enforcement officers attestations that they believed this travel to be indicative of Defendant distributing controlled substances and collecting proceeds from the sale of controlled substances; and corroborated reports that Defendant was a supplier and distributor of methamphetamine in the Beltrami County area. No such allegations exist regarding Mr. Sarmiento, and there does not appear to have been any physical or electronic surveillance of Mr. Sarmiento indicating that he engaged in similar chargeable conduct. Moreover, Defendant's criminal history, as outlined in the affidavits in support of the various Search Warrants, is also more extensive than Mr. Sarmiento's criminal history as outlined in those same affidavits.

Further, as discussed above, during the December 7, 2019, search of Defendant's Naytahwaush residence law enforcement officers discovered a safe containing a "a large amount o[f] suspected heroin, currency, scales, pistol ammunition and a medical card for" Defendant. (Gov't's Ex. 4). On the record now before the Court, there is not any such allegation relative to Mr. Sarmiento. In short, Defendant has fallen well short of his "heavy" burden here.

Defendant has also failed to demonstrate that the decision to prosecute him and not Mr. Sarmiento was motivated in any way by a discriminatory purpose. Other than Defendant's

conclusory assertion that Mr. Sarmiento is "Caucasian," Defendant fails to even allege any discriminatory purpose. This again falls well short of Defendant's "heavy" burden.

Therefore, the undersigned recommends that Defendant's Motion to Dismiss the Indictment, [Docket No. 65], be **DENIED**.

In his fourth Motion to Dismiss the Indictment, [Docket No. 69], Defendant argues that the present Indictment should be dismissed because the present prosecution is "vindictive" in nature. Specifically, Defendant argues that he is being improperly prosecuted because while he was exercising his "constitutional right" to await all discovery during the pendency of his State Court charges, he was indicted in the present Federal case. In support of this assertion, Defendant relies on the fact that the Federal prosecutor sent a letter to Defendant's counsel in the State Court action informing her that Defendant would not be indicted in Federal Court if he pled guilty to the State Court charges against him in Beltrami County and Mahnomen County and admitted to the federal supervised release violation alleged against him.

"A prosecution designed solely to punish a defendant for exercising a valid legal right violates due process." United States v. Leathers, 354 F.3d 955, 961 (8th Cir. 2004). "The defendant has the burden to demonstrate that the 'prosecution was brought in order to punish [him] for the exercise of a legal right,' and because of the broad discretion given to prosecutors in performing their duties, the defendant's burden to show vindictive prosecution is 'a heavy one.'" United States v. Williams, 793 F.3d 957, 963 (8th Cir. 2015) (quoting Leathers, 354 F.3d at 961).

Regarding meeting this "heavy burden," the Eighth Circuit Court of Appeals has observed:

> A defendant can establish prosecutorial vindictiveness through two methods; first, with "objective evidence of the prosecutor's vindictive or improper motive in

increasing the number or severity of charges." "Absent such evidence, a defendant may, in *rare* instances, rely upon a presumption of vindictiveness, if he provides sufficient evidence to show a reasonable likelihood of vindictiveness exists." In determining whether the presumption of vindictiveness applies we examine "the prosecutor's actions in the context of the entire proceedings."

Id. (citation omitted) (emphasis in original).

In the present case, Defendant has failed to demonstrate prosecutorial vindictiveness under either method. First, Defendant has failed to offer any <u>objective</u> evidence that the prosecutors in the present case filed the present Indictment in order to punish Defendant for exercising his right to discovery in the State Court case or any other constitutional right. Second, the circumstances surrounding the present Indictment fail to establish a reasonable likelihood of vindictiveness, and therefore, no presumption of vindictiveness arises.

Defendant appears to rely primarily on the fact that while he was awaiting discovery in State Court, he was indicted in the present Federal case, and that chronology, Defendant argues, violated his right to discovery. "[T]iming alone," however, "is insufficient to trigger the presumption of vindictiveness. Indeed, '[a] presumption does not arise just because action detrimental to the defendant was taken after the exercise of the defendant's legal rights; the context must also present a reasonable likelihood of vindictiveness.'" Id. (citing <u>United States v. Campbell</u>, 410 F.3d 456, 462 (8th Cir. 2005)). Defendant has failed to meet his "heavy" burden of demonstrating the prosecution of the present case is vindictive in nature.

Therefore, the undersigned recommends that Defendant's Motion to Dismiss the Indictment, [Docket No. 69], be **DENIED**.

### III.    Defendant's Motion to Suppress DNA Evidence. [Docket No. 31].

Defendant next moves the Court for an Order suppressing all evidence obtained from the execution of the June 10, 2020, DNA Search Warrant executed in Defendant's jail cell. During

the execution of this June 10, 2020, DNA Search Warrant, SA Hart seized two cups and a spoon from Defendant's jail cell at the Tri-County Corrections jail for the purposes of securing a known DNA sample.[19]

Other than the Motion to Suppress DNA Evidence, [Docket No. 31], filed by his formal counsel, Defendant does not appear to offer any argument in support of this Motion. The Motion only conclusorily asserts that the affidavit in support of the June 10, 2020, DNA Search Warrant failed to "establish the requisite probable cause required to sustain a legal search and seizure of [Defendant's] DNA evidence." (Id.).

### A. Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).

The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical

---

[19] Defendant's previous counsel's boilerplate Motion also references the June 9, 2020, DNA Buccal Swab Search Warrant which authorized SA Hart to collect a buccal swab from Defendant. The Motion does not, however, appear to seek suppression of any evidence flowing from the June 9, 2020, DNA Buccal Swab Search Warrant. This is likely because the June 9, 2020, DNA Buccal Swab Search Warrant was never executed as Defendant refused to comply with said Search Warrant.

considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 9-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005)) (alterations in Wiley). In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. at 238–39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

### B.  Analysis

As noted above, Defendant seeks an Order of this Court suppressing evidence flowing from the execution of the June 10, 2020, DNA Search Warrant which authorized law

enforcement officers to seize personal items from Defendant's jail cell for the purposes of securing a known DNA sample. Defendant's argument here is his lone conclusory assertion that the affidavit submitted in support of the June 10, 2020, DNA Search Warrant failed to establish the requisite probable cause.

As discussed above, "a magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009) (quoting United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000) (citing United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993)).

Considering the affidavit submitted in support of the June 10, 2020, DNA Search Warrant which authorized law enforcement to seize personal items from Defendant jail cell for the purposes of obtaining a known DNA sample, Judge Rasmusson could reasonably have concluded that there was a fair probability that evidence of the alleged crimes would be found through Defendant's DNA sample.

Specifically, the Court notes that in his affidavit, submitted in support of the warrant application, SA Hart provided a summary of the investigation, including law enforcement's physical and electronic surveillance of Defendant traveling from Bemidji, Minnesota, to the Minneapolis area; law enforcement's belief that Defendant was conducting said travel to obtain amounts of controlled substances for further distribution in the Beltrami County area; and the fact that Defendant was arrested during the execution of a search warrant at a residence where approximately 3.6 grams of suspected cocaine, 11.8 grams of suspected heroin, and 68.8 grams

of suspected methamphetamine were seized. SA Hart attested that the Bureau of Criminal Apprehension provide him with a forensic report which indicated that the suspected controlled substances were the actual controlled substances with a 95% confidence level. Most important, SA Hart also attested that the Bureau of Criminal Apprehension had examined the packaging in which the controlled substances were contained to find "a major male DNA profile" which matched Defendant's "offender sample." SA Hart also attested that based on his training and experience he knew that the Bureau of Criminal Apprehension could compare the DNA profile discovered on the packaging with a known DNA sample for comparison purposes.

Upon review of SA Hart's affidavit, this Court finds that Judge Rasmusson had a sufficient basis upon which to believe that probable cause existed for the issuance of the June 10, 2020, DNA Search Warrant. The affidavit contains information concerning Defendant's alleged involvement in the distribution of a controlled substance; the match between the male DNA profile found on the controlled substance packaging and Defendant's "offender [DNA] sample"; and Defendant's failure to comply with the June 9, 2020, DNA Buccal Swab Search Warrant. SA Hart also attested that he personally observed Defendant drinking from a cup which SA Hart knew to be purchased for individual use from the jail canteen, and he attested that based on his training and experience he knew that inmates kept personal items, such as toothbrushes and cups, stored in their jail cells. The affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence relevant to the commission of a crime.

In addition, assuming solely for the sake of argument that the affidavit of SA Hart was not sufficient to establish probable cause, the Court concludes that officers relied in good faith on

the probable cause determination by Judge Rasmusson when executing the June 10, 2020, DNA Search Warrant.

Although evidence obtained as a result of the execution of a warrant unsupported by probable cause is generally inadmissible, Mapp v. Ohio, 367 U.S. 643 (1961), there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." Davis v. United States, 564 U.S. 229, 238–39 (2011) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)). There are four circumstances in which the good-faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

United States v. Marion, 238 F.3d 965, 969 (2001). Regarding the June 10, 2020, DNA Search Warrant, Defendant fails to offer any specific argument as to why the Leon good-faith exception would not apply.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of Defendant's jail cell for personal items containing known DNA militates against suppressing the evidence obtained during the execution of the June 10, 2020, DNA Search Warrant. In his affidavit in support of his application for a search warrant, SA Hart presented sufficient facts indicating that Defendant was the individual in possession of the controlled substances found during the execution of the December 6, 2019, and December 7, 2019, Search Warrants, including the fact that Defendant's "offender [DNA] sample" matched the DNA profile discovered by the Bureau of Criminal Apprehension on the packaging which

contained the controlled substances. Accordingly, the affidavit in support of the June 10, 2020, DNA Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." In addition, it did not render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

Thus, the Court concludes that the officers involved relied in good faith on the June 10, 2020, DNA Search Warrant which had been issued by Judge Rasmusson.

Therefore, the undersigned recommends that Defendant's Motion to Suppress DNA Evidence, [Docket No. 31], be **DENIED**.

## IV. Defendant's Motions to Suppress Electronic Evidence. [Docket Nos. 32, 55, 58, 61, 63].

Defendant also seeks an Order of this Court suppressing any evidence flowing from the November 27, 2019, Search Warrant which authorized "the installation and use of: **a pen register, trap and trace device including caller identification, electronic tracking device, and/or cellular tower location and service information, including services such as Global Positioning System (GPS) technology, precision location related technologies, and/or a tracking warrant** on telephone number **218-401-2024**." (Gov't's Ex. 2) (emphasis in original). In addition to arguing that the affidavit submitted in support of the application for the November 27, 2019, Tracking Warrant lacks probable cause, Defendant also proffers several other arguments in support of his assertion that all evidence flowing from the November 27, 2019, Tracking Warrant should be suppressed.

Defendant argues that the evidence flowing from the November 27, 2019, Tracking Warrant should be suppressed because the November 27, 2019, Tracking Warrant fails to comply with the various provisions of Title III of the Omnibus Criminal Control and Safe Streets Act. (See, Def.'s Mot., [Docket No. 55], at 2–5; Def.'s Mot., [Docket No. 58], at 1–2; Def.'s

Mot., [Docket No. 61], at 1–6; Def.'s Mot., [Docket No. 63], at 1, 3–4; Def.'s Mem., [Docket No. 76], at 1–13; Def.'s Mem., [Docket No. 77], at 2–4). The Court's finds Defendant's argument to be unpersuasive.

Title III of the Omnibus Criminal Control and Safe Streets Act, codified as 18 U.S.C. § 2510, et seq., prohibits the interception of wire, oral, or electronic communications except under certain prescribed circumstances. Title III provides that an "aggrieved person" can move to suppress the contents of intercepted communications and evidence derived from those interceptions. See, United States v. O'Connell, 841 F.2d 1408, 1416 (8th Cir. 1988). Title III defines "intercept" as "the aural or other acquisition of the <u>contents</u> of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4) (emphasis added).

Defendant's arguments fail here because the November 27, 2019, Tracking Warrant is not a warrant subject to Title III of the Omnibus Criminal Control and Safe Streets Act. The November 27, 2019, Tracking Warrant did not permit the acquisition of the <u>contents</u> of any communication. Because the November 27, 2019, Tracking Warrant was not a warrant subject to Title III, the November 27, 2019, Tracking Warrant was not required to comply with Title III of the Omnibus Criminal Control and Safe Streets Act.[20]

Defendant also makes two generalized assertions that SA Hart's affidavit in support of the application for the November 27, 2019, Tracking Warrant lacks probable cause. Defendant's

---

[20] Defendant also argues that the November 27, 2019, Tracking Warrant violates the Minnesota Privacy of Communication Act, and it should therefore be suppressed. (See, Def.'s Mot., [Docket No. 58], at 1–2; Def.'s Mot., [Docket No. 61], at 2–6; Def.'s Mem., [Docket No. 76], at 1–13; Def.'s Mem., [Docket No. 77], at 1–4). For the same reasons discussed above, this argument fails. The Minnesota Privacy of Communication Act prohibits the interception of any wire, electronic, or oral communication; however, it specifically defines "intercept" to be "the aural or other acquisition of the <u>contents</u> of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Minn. Stat. § 626A.01, Subd. 5 (emphasis added). As discussed above, the November 27, 2019, Tracking Warrant did not authorize the acquisition on the contents of any communication. Thus, the November 27, 2019, Tracking Warrant is not subject to the requirements of the Minnesota Privacy of Communication Act.

probable cause argument appears to be based on his assertion that the confidential informants were not "qualified." (See, Def.'s Mot. [Docket No. 32]; Def.'s Mem., [Docket No. 77], at 4).

**A.  Standard of Review**

See, section III.A above.

**B.  Analysis**

The Court first considers whether the information from the confidential informants, if reliable, along with the other information contained in SA Hart's affidavit, would have provided Judge Melbye with a substantial basis on which to conclude that probable cause existed to issue the November 27, 2019, Tracking Warrant.

SA Hart's affidavit provided that Confidential Informant 1 and Cooperating Defendant 1 each independently informed SA Hart that Defendant was a supplier and distributor of methamphetamine in the Beltrami County area. Moreover, Confidential Informant 1 and Cooperating Defendant 1 each separately informed SA Hart that they contacted Defendant at the same 218-401-2024 telephone number to arrange for controlled substance transactions. Confidential Informant 1 also reported that they had made multiple purchases of methamphetamine and heroin from Defendant, and Confidential Informant 1 further reported that they had observed Defendant in possession of controlled substances in quantities which SA Hart attested were based on his training and experience associated with distribution rather than personal use.

It is well established that "[t]he statements of a reliable confidential informant are themselves sufficient to support probable cause for a search warrant." United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998) (citations omitted). SA Hart further attested that based on his training and experience he knew "individuals involved in the distribution of controlled

substances often use their cell phones to arrange narcotics transactions," and "cellular phones capture location information" which "can be fruitful in investigations regarding controlled substances, as it shows where the individual has recently been, and where these individuals frequent." (Gov't's Ex. 2). He further provided that "obtaining cellular phone data assists law enforcement with surveillance efforts on subjects involved in the controlled substance trafficking investigation." (Id.).

Accordingly, upon reviewing the totality of the circumstances, the Court concludes that, if the representation of Confidential Informant 1 and Cooperating Defendant 1 were reliable, SA Hart's affidavit in support of the application for the November 27, 2019, Tracking Warrant would have provided Judge Melbye with a substantial basis on which to conclude that probable cause existed to justify issuance of the November 27, 2019, Tracking Warrant.

Defendant, however, contends that Confidential Informant 1 and Cooperating Defendant 1 were not reliable or "qualified." Therefore, according to Defendant, they cannot be the basis upon which probable cause exists.

"The reliability of a confidential informant can be established if the person has a history of providing law enforcement officials with truthful information." United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998) (citations omitted). SA Hart's affidavit in support of the November 27, 2019, Tracking Warrant specifically provided that Confidential Informant 1 had previously provided information which led to the issuance of search warrants and the arrest of persons for controlled substances crimes. Further lending to their reliability of Confidential Informant 1, SA Hart attested that Confidential Informant 1 had conduct multiple controlled purchases of controlled substances under the direction of law enforcement. United States v. Lucca, 377 F.3d 927, 933 (8th Cir. 2004) (providing that an "informant's track record of reliability [can be]

established by successful controlled purchases"). On the record now before the Court, SA Hart's affidavit in support of the application for the November 27, 2019, Tracking Warrant demonstrated that Confidential Informant 1 had a history of successfully assisting law enforcement officers.

Moreover, "[i]f [some] information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." United States v. Williams, 10 F.3d 590, 593 (8th Cir.1993) (citations omitted); see, United States v. Leppert, 408 F.3d 1039, 1041 (8th Cir. 2005). "Even the corroboration of minor, innocent details can suffice to establish probable cause." United States v. Buchanan, 574 F.3d 554, 562 (8th Cir. 2009) (quoting United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001)). Information provided by one confidential informant can corroborate information independently provide by another confidential informant. See, e.g., United States v. Fulghum, 143 F.3d 399, 401 (8th Cir. 1998).

SA Hart's affidavit provided that certain information provided by Cooperating Defendant 1 was verified by law enforcement, and other information provided by Cooperating Defendant 1 was corroborated by the independent reports of Confidential Informant 1. For example, Cooperating Defendant 1 and Confidential Informant 1 separately reported that they contacted Defendant at the same 218-401-2024 telephone number to arrange transactions involving controlled substances. SA Hart's affidavit further provided that certain information provided by Confidential Informant 1, such as name cell phone numbers, locations, vehicles, and methods of operations involving controlled substance crimes, had been verified by law enforcement surveillance. Both Confidential Informant 1 and Cooperating Defendant 1 also each

independently informed SA Hart that Defendant was a supplier and distributor of methamphetamine in the Beltrami County area. Further lending credibility to Cooperating Defendant 1 is the fact that SA Hart attested that Cooperating Defendant 1 provided a statement against their own penal interest. See, e.g., United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996) (explaining that statements against the penal interest of an informant carry considerable weight in determining credibility).

Defendant is correct that SA Hart's affidavit fails to include the criminal history of Cooperating Defendant 1. While it appears that SA Hart intended to included Cooperating Defendant 1's criminal history, SA Hart merely wrote that he had reviewed the "criminal history and observed . . . . ." (Gov't's Ex. 2) (ellipses in original). SA Hart was not, however, required to include Cooperating Defendant 1's criminal history. Moreover, although Cooperating Defendant 1's criminal history was later disclosed in a separate affidavit which was disclosed to Defendant in the present case, Defendant has not here pointed to any basis on which this Court could concluded that Cooperating Defendant 1's criminal history would have precluded finding a sufficient basis upon which Judge Melbye could have found Cooperating Defendant 1 to be reliable.

In the present case, the record reflects that SA Hart's affidavit submitted in support of the November 27, 2019, Tracking Warrant demonstrated that Confidential Informant 1 had previously provided reliable information to law enforcement; that certain parts of the information provided by Confidential Informant 1 and Cooperating Defendant 1 had also been independently corroborated; and that Cooperating Defendant 1 provided statements against their penal interest. Analogous to the facts in Wright, under the totality of the circumstance, this information

adequately established that Confidential Informant 1 and Cooperating Defendant 1 were reliable. Wright, 145 F.3d at 975.

SA Hart's affidavit sufficiently connects Defendant to the 218-401-2024 telephone number, and it articulates information received from two reliable informants regarding Defendant being a provider of methamphetamine to the Beltrami County area by using the 218-401-2024 telephone number to arrange transactions involving controlled substances. On the present record, the Court finds that SA Hart's affidavit in support of the application for the November 27, 2019, Tracking Warrant demonstrates that Judge Melbye had a substantial basis upon which to conclude that the execution of the November 27, 2019, Tracking Warrant would uncover evidence of a crime, and that, as a result, probable cause existed for the issuance of the November 27, 2019, Tracking Warrant.

In addition, assuming solely for the sake of argument that the affidavit of SA Hart was not sufficient to establish probable cause, the Court here too concludes that officers relied in good faith on the probable cause determination by Judge Melbye when executing the November 27, 2019, Tracking Warrant.

Although evidence obtained as a result of the execution of a warrant unsupported by probable cause is generally inadmissible, Mapp v. Ohio, 367 U.S. 643 (1961), there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." Davis v. United States, 564 U.S. 229, 238-39 (2011) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)). There are four circumstances in which the good-faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to

render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

United States v. Marion, 238 F.3d 965, 969 (2001). Regarding the November 27, 2019, Tracking Warrant, Defendant argues that Judge Melby abandoned his judicial role because he signed the "application and affidavit," as well as, the "actual Court Order." (Def.'s Mot. [Docket No. 55], at 2).

Defendant's argument here is plainly meritless. Judge Melbye signed the last page of the application for the November 27, 2019, Tracking Warrant as the judicial officer before whom SA Hart "[s]ubscribed and swor[e] to" the facts attested to in the submitted affidavit. Judge Melbye did not abandon his judicial role; rather, he signed the affidavit specifically in his judicial role. Judge Melbye was presented with and considered the reliable information presented in the application and affidavit to the Court and he made his probable cause decision on the basis of that information. The Defendant has not shown otherwise. There is no evidence on the record now before the Court that Judge Melbye "wholly abandoned his judicial role."

Therefore, the undersigned recommends that Defendant's Motions to Suppress Electronic Evidence, [Docket Nos. 32, 55, 58, 61, 63], be **DENIED**.

## V.    Defendant's Motions to Suppress Physical Evidence. [Docket Nos. 33, 62, 64].

Defendant next seeks an Order of this Court suppressing all evidence flowing from the December 6, 2019, Search Warrant and the December 7, 2019, Search Warrant which authorized law enforcement to search Defendant's Naytahwaush residence.

As observed above, the December 6, 2019, Search Warrant authorized law enforcement to search Defendant's Naytahwaush residence, as well as, the 2011 GMC Sierra located at said residence for "[d]ocuments and materials commonly used, stored and maintained by traffickers

of illegal drugs to include but not limited to . . . [w]ritten materials . . . and other papers relating to the transportation, ordering, possession, sale and distribution of illegal drugs and concealment and trafficking of currency" and United States currency. (Gov't's Ex. 3). On December 7, 2019, law enforcement officers executed the December 6, 2019, Search Warrant upon Defendant's Naytahwaush residence.

During the execution of the December 6, 2019, Search Warrant, law enforcement officers located a "safe" which they observed to "contain a large amount o[f] suspected heroin, currency, scales, pistol ammunition and a medical card for" Defendant. (Gov't's Ex. 4). Law enforcement officers "stopped the search in order to draft another warrant to include illegal substances" including "but not limited to heroin." (Id.). While the new application for a search warrant was drafted, law enforcement officers remained at the Naytahwaush residence. (Id.). SA Larson obtained the December 7, 2019, Search Warrant which authorized law enforcement to search Defendant's Naytahwaush residence and the GMC Sierra located there for "[c]ontrolled substances including, [sic] but not limited to heroin"; items associate with the distribution of heroin; firearms and ammunition; items or documents "showing off premises storage facilities"; and "[a]ll money, precious metals, [and] precious stones found in close proximity to controlled substances." (Id.).

Defendant argues that the evidence flowing from the December 6, 2019, Search Warrant and the December 7, 2019, Search Warrant should be suppressed because SA Larson's affidavits submitted in support of the applications for these Search Warrants failed to establish probable cause. (See, Def.'s Mot. [Docket No. 32]; Def.'s Mot. [Docket No. 64]). Specifically, Defendant argues that the affidavits failed to establish a nexus between Defendant's Naytahwaush residence and the items to be seized. (Def.'s Mot., [Docket No. 64], at 1–3). Defendant further argues that

SA Larson's affidavits failed to "establish[] the informants' reliability . . . ." (Def.'s Mot., [Docket No. 64, at 3; Def.'s Mot. [Docket No. 32]).[21]

### A. Standard of Review

See, section III.A. above.

### B. Analysis

#### 1. December 6, 2019, Search Warrant

The Court first considers whether the information from the confidential informants, if reliable, along with the other information contained in SA Larson's affidavit, would have provided Judge Rivera-Spalla with a substantial basis on which to conclude that probable cause existed to issue the December 6, 2019, Search Warrant.

SA Larson's affidavit provided that Confidential Informant 3 and Cooperating Defendant 1 each independently informed law enforcement that Defendant was a supplier and distributor of methamphetamine in the Beltrami County area. Moreover, Confidential Informant 3 and Cooperating Defendant 1 each separately informed law enforcement that they contacted Defendant at the same 218-401-2024 telephone number to arrange for controlled substance

---

[21] Defendant also makes two arguments based on factual inaccuracies. First, Defendant asserts that a GPS tracker was illegally placed on his vehicle, and therefore, any information in SA Larson's affidavit that was obtained from that GPS tracker must be stricken from said affidavit. (Def.'s Mot., [Docket No. 64], at 2). On the record now before the Court, however, there is no indication that any GPS tracker was placed on any vehicle. To the extent Defendant is referring to the November 27, 2019, Tracking Warrant, the Court has already addressed that Warrant above, and it has been found to be constitutionally permissible. Defendant also conclusorily asserts that the December 7, 2019, Search Warrant necessarily fails because it was obtained after the items had already been seized. This assertion, however, is not supported by the record now before the Court. Rather, the record now before the Court provides that when the officers observed the suspected controlled substances and ammunition, they stopped the search of Defendant's Naytahwaush residence while SA Larson secured the December 7, 2019, Search Warrant. This is supported by the very documents reference by Defendant. For instance, Defendant attached to his Motion a portion of report created by an unknown law enforcement officer following the December 7, 2019, search of Defendant's Naytahwaush residence, however, the report specifically provides that upon observing the suspected heroin, law enforcement officers stopped the search while SA Larson applied for the December 7, 2019, Search Warrant. Defendant also points to the "Receipt, Inventory and Return" from the December 7, 2019, search; however, the "Receipt, Inventory and Return" associated with the December 7, 2019, Search Warrant specifically provides a time stamp indicating that the search was not begun, and no items seized, until after SA Larson obtained the December 7, 2019, Search Warrant. (See, Gov't's Ex. 5).

transactions. Confidential Informant 2 reported that they had personally observed Defendant in possession of an amount of methamphetamine which SA Hart described based on his training and experience as commonly associated with sale of controlled substances rather than personal use. Confidential Informant 2 further reported that in the two weeks prior to December 6, 2019, they had personally observed a large amount of currency at Defendant's Naytahwaush residence; Confidential Informant 2 verified Defendant's Naytahwaush residence was the residence where they had seen the currency through a picture of Defendant's Naytahwaush residence provided by law enforcement.

Confidential Informant 3 also reported that Defendant was selling heroin out of the Farrow residence and the Skinaway residence by dropping off the controlled substances at each location and then later returning to collect the proceeds from the sale of said controlled substances. Confidential Informant 3 also reported that Defendant did not reside in Bemidji, Minnesota. In the seventy-two hours prior to the application for the December 6, 2019, Search Warrant, Confidential Informant 3 conducted a controlled purchased of heroin from Mr. Skinaway during which Mr. Skinaway "spoke openly about distribut[ing] the heroin for" Defendant.

Cooperating Defendant 1 reported that Defendant had a blue truck, and Defendant had "sources" in the Twin Cities where he obtained "large amount[s] of controlled substances for further distribution." Cooperating Defendant 1 also reported personally observing Defendant "in possession of larger amounts of heroin and methamphetamine for further distribution." It is well established that "[t]he statements of a reliable confidential informant are themselves sufficient to support probable cause for a search warrant." United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998) (citations omitted).

Further, SA Larson attested that SA Hart personally observed a white Lincoln Town Car registered to Defendant at both the Farrow residence and the Skinaway residence. At the Farrow residence, SA Hart also personally observed "short term vehicle and foot traffic" which based on his training and experience he described as "highly indicative [of] the distribution of controlled substances under the totality of the investigation." Law enforcement officers also physically observed the GMC Sierra registered to Defendant at both the Farrow residence and the Skinaway residence. SA Larson also attested that through electronic surveillance law enforcement observed that Defendant regularly travel from Bemidji, Minnesota to the Twin Cities, including areas where the law enforcement officers had conducted multiple controlled purchases of controlled substances. SA Larson further attested that through electronic and physical surveillance law enforcement officers observed that every twenty-four hours Defendant, a times in the GMC Sierra, travelled from his Naytahwaush residence to the area of Bemidji, Minnesota where he remained for approximately twelve hours making several trips between the Farrow residence and the Skinaway residence. On December 3, 2019, law enforcement officers also physically observed the GMC Sierra at Defendant's Naytahwaush residence at times when electronic surveillance also placed Defendant at his Naytahwaush residence.

SA Larson also attested that based on the information collected through the investigation he believed Defendant was utilizing the GMC Sierra for controlled substances crimes, and Defendant was "transporting controlled substance and/or proceeds from controlled substances sales" between the Farrow residence, the Skinaway residence, and Defendant's Naytahwaush residence. SA Larson further attested that based on his training and experience "drug distributors maintain books, records, receipts, notes, ledgers, airline tickets, money orders and other papers relating to the transportation, ordering, possession, sale and distribution of drugs," and that these

items "are usually maintained at the suspect's residence or within their vehicles." The Eighth Circuit Court of Appeals has found similar language under similar circumstance creates an inference that such records, paraphernalia, and other evidence of the sale of controlled substances exist at the suspects residence. See, e.g., United States v. Ross, 487 F.3d 1120, 1123 (8th Cir. 2007) (collecting cases); United States v. Keele, 589 F.3d 940, 944 (8th Cir. 2009).

Accordingly, upon reviewing the totality of the circumstances, the Court concludes that, if the representation of Confidential Informants 1, 2, and 3, as well as, Cooperating Defendant 1 were reliable, SA Larson's affidavit in support of the application for the December 6, 2019, Search Warrant would have provided Judge Rivera-Spalla with a substantial basis upon which to conclude that probable cause existed to justify issuance of the December 6, 2019, Search Warrant.

Defendant, however, contends that Confidential Informants 1, 2, and 3, as well as, Cooperating Defendant 1 were not reliable. Therefore, according to Defendant, they cannot be the basis upon which probable cause exists. The Court has previously here determined Confidential 1 and Cooperating Defendant 1 are reliable sources.

"The reliability of a confidential informant can be established if the person has a history of providing law enforcement officials with truthful information." United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998) (citations omitted). SA Larson's affidavit in support of the December 6, 2019, Search Warrant specifically provided that Confidential Informants 1 and 2 had each previously provided information which led to the issuance of search warrants and the arrest of persons for controlled substances crimes and/or firearms related crimes. SA Larson further attested that Confidential Informants 1, 2, and 3 had provided law enforcement with information which had been independently verified by law enforcement. Further lending to the

41

reliability of Confidential Informants 1, 2, and 3, SA Larson attested that Confidential Informants 1, 2, and 3, had conducted multiple controlled purchases of controlled substances under the direction of law enforcement. United States v. Lucca, 377 F.3d 927, 933 (8th Cir. 2004) (providing that an "informant's track record of reliability [can be] established by successful controlled purchases"). On the record now before the Court, SA Larson's affidavit in support of the application for the December 6, 2019, Search Warrant demonstrated that Confidential Informant 1, Confidential Informant 2, and Confidential Informant 3 each had a history of successfully assisting law enforcement officers.

Moreover, "[i]f [some] information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." United States v. Williams, 10 F.3d 590, 593 (8th Cir.1993) (citations omitted); see, United States v. Leppert, 408 F.3d 1039, 1041 (8th Cir. 2005). "Even the corroboration of minor, innocent details can suffice to establish probable cause." United States v. Buchanan, 574 F.3d 554, 562 (8th Cir. 2009) (quoting United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001)). Information provided by one confidential informant can corroborate information independently provide by another confidential informant. See, e.g., United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998).

SA Larson's affidavit provided that certain information provided by Confidential Informants 1, 2, and 3, as well as, Cooperating Defendant 1 was verified by law enforcement and corroborated by the independent reports of the other confidential informants. For example, Cooperating Defendant 1 and Confidential Informant 3 separately reported that they contacted Defendant at the same 218-401-2024 telephone number to arrange transactions involving

42

controlled substances. Confidential Informant 3 and Cooperating Defendant 1 both independently identified Defendant as a "source" or supplier of controlled substances.

Further lending credibility to Confidential Informant 3 is the fact that SA Larson attested that Confidential Informant 3 provided a statement against their own penal interest. See, e.g., United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996) (explaining that statements against the penal interest of an informant carry considerable weight in determining credibility).

In the present case, the record reflects that SA Larson's affidavit submitted in support of the application for the December 6, 2019, Search Warrant demonstrated that Confidential Informant 1, Confidential Informant 2, and Confidential Informant 3 had each previously provided reliable information to law enforcement; that certain parts of the information provided by Confidential Informant 1, Confidential Informant 2, Confidential Informant 3, and Cooperating Defendant 1 had also been independently corroborated; and that Confidential Informant 3 provided statements against their penal interest. Under the totality of the circumstance, this information adequately established that Confidential Informant 1, Confidential Informant 2, Confidential Informant 3, and Cooperating Defendant 1 were reliable. Wright, 145 F.3d at 975.

On the above basis, the Court finds that SA Larson's affidavit in support of the application for the December 6, 2019, Search Warrant demonstrates that Judge Rivera-Spalla had a substantial basis upon which to conclude that the execution of the December 6, 2019, Search Warrant would uncover evidence of a crime, and that, as a result, probable cause existed for the issuance of the December 6, 2019, Search Warrant.

In addition, assuming solely for the sake of argument that the affidavit of SA Larson was not sufficient to establish probable cause, the Court concludes that officers relied in good faith on

the probable cause determination by Judge Rivera-Spalla when executing the December 6, 2019, Search Warrant.

Although evidence obtained as a result of the execution of a warrant unsupported by probable cause is generally inadmissible, Mapp v. Ohio, 367 U.S. 643 (1961), there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." Davis v. United States, 564 U.S. 229, 238-39 (2011) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)). There are four circumstances in which the good-faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

United States v. Marion, 238 F.3d 965, 969 (2001).

The record presently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of Defendant's Naytahwaush residence militates against suppressing the evidence obtained during the execution of the December 6, 2019, Search Warrant. In his affidavit in support of his application for a search warrant, SA Larson presented sufficient facts indicating that Defendant was a supplier and distributor of methamphetamines to the Beltrami County area; that Defendant travelled between his Naytahwaush residence and the area of Bemidji, Minnesota; that Defendant utilized the GMC Sierra in supplying and distributing methamphetamines to the Beltrami County area; and that the execution of the December 6, 2019, Search Warrant would lead to evidence of a crime. Accordingly, the affidavit in support of the December 6, 2019, Search Warrant was not "so lacking in indicia of probable

cause as to render official belief in its existence entirely unreasonable" nor did it render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." Likewise, there is simply no evidence on the record now before the Court that Judge Rivera- Spalla "wholly abandoned [her] judicial role."

Therefore, to the extent Defendant's Motion to Suppress Physical Evidence seeks to suppress evidence flowing from the execution of December 6, 2019, Search Warrant, the undersigned recommends that Defendant's Motion to Suppress Physical Evidence, [Docket Nos. 33, 62, 64], be **DENIED**.

### 2. December 7, 2019, Search Warrant

As discussed above, during the execution of the December 6, 2019, Search Warrant, law enforcement officers located a "safe" which law enforcement officers observed to "contain a large amount o[f] suspected heroin, currency, scales, pistol ammunition and a medical card for" Defendant. (Gov't's Ex. 4). Law enforcement officers "stopped the search in order to draft another warrant to include illegal substances" including "but not limited to heroin." (Id.).

The December 7, 2019, Search Warrant, applied for and obtained while the search of Defendant's Naytahwaush residence was paused, authorized law enforcement to search Defendant's Naytahwaush residence and the GMC Sierra located there for "[c]ontrolled substances including, [sic] but not limited to heroin"; items associate with the distribution of heroin; firearms and ammunition; items or documents "showing off premises storage facilities"; "[a]ll money, precious metals, [and] precious stones found in close proximity to controlled substances." (Id.).

SA Larson's affidavit submitted in support of the application for the December 7, 2019, Search Warrant contains all of the details of the investigation as provided in his affidavit in

support of the application for the December 6, 2019, Search Warrant—as discussed above. SA Larson also attested that during the execution of the December 6, 2019, Search Warrant law enforcement officers located a safe "contain[ing] a large amount o[f] suspected heroin, currency, scales, pistol ammunition, and a medical card for" Defendant. (Gov't's Ex. 4).

On the record now before the Court, the undersigned finds that SA Larson's affidavit in support of the application for the December 7, 2019, Search Warrant demonstrates that Judge Rivera-Spalla had a substantial basis upon which to conclude that the execution of the December 7, 2019, Search Warrant would uncover evidence of a crime, and that, as a result, probable cause existed for the issuance of the December 7, 2019, Search Warrant. For all the reasons discussed above in relation to the December 6, 2019, Search Warrant, SA Larson's affidavit sufficiently connects Defendant Naytahwaush residence and the GMC Sierra located there with the sale of controlled substances, and it articulates information received from four reliable informants regarding Defendant being a provider of methamphetamine to the Beltrami County area. Moreover, SA Larson's affidavit in support of the application for the specifically provides that law enforcement officers personally observed suspected heroin, controlled substances paraphernalia, and piston ammunition, while they were already lawfully executing the December 6, 2019, Search Warrant. Judge Rivera-Spalla had not only a substantial basis upon which to conclude that the execution of the December 7, 2019, Search Warrant would uncover evidence of a crime, Judge Rivera-Spalla had a sworn affidavit providing that such evidence had already been lawfully observed immediately before the application for the December 7, 2019, Search Warrant.

In addition, assuming solely for the sake of argument that the affidavit of SA Larson was not sufficient to establish probable cause, the Court concludes that officers relied in good faith on

the probable cause determination by Judge Rivera-Spalla when executing the December 7, 2019, Search Warrant.

The record presently before the Court shows that law enforcement's good-faith reliance on the December 7, 2019, Search Warrant authorizing the search of Defendant's Naytahwaush residence militates against suppressing the evidence obtained during the execution of the December 7, 2019, Search Warrant. In his affidavit in support of his application for the December 7, 2019, Search Warrant, SA Larson presented sufficient facts indicating that Defendant was a supplier and distributor of methamphetamines to the Beltrami County area; that Defendant travelled between his Naytahwaush residence and the area of Bemidji, Minnesota; that Defendant utilized the GMC Sierra in supplying and distributing methamphetamines to the Beltrami County area; that the execution of the December 7, 2019, Search Warrant would led to evidence of a crime; and that law enforcement officers had lawfully observed suspected heroin, controlled substance paraphernalia, and pistol ammunition in Defendant's Naytahwaush residence. Accordingly, the affidavit in support of the December 7, 2019, Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" nor did it render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." Likewise, there is once again simply no evidence on the record now before the Court that Judge Rivera-Spalla "wholly abandoned [her] judicial role."

Therefore, to the extent Defendant's Motion to Suppress Physical Evidence seeks to suppress evidence flowing from the execution of December 7, 2019, Search Warrant, the undersigned recommends that Defendant's Motion to Suppress Physical Evidence, [Docket Nos. 33, 62, 64], be **DENIED**.

## VI.    Conclusion

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED THAT**:

1. Defendant's Motion to Supress DNA Evidence, [Docket No. 31], be **DENIED**;

2. Defendant's Motion to Supress Electronic Surveillance Evidence, [Docket No. 32], be **DENIED**;

3. Defendant's Motion to Supress Physical Evidence, [Docket No. 33], be **DENIED**;

4. Defendant's Motion to Supress Electronic Surveillance Evidence, [Docket No. 55], be **DENIED**;

5. Defendant's Motion to Supress Electronic Surveillance Evidence, [Docket No. 58], be **DENIED**;

6. Defendant's Motion to Dismiss Indictment, [Docket No. 59], be **DENIED**;

7. Defendant's Motion to Dismiss Indictment, [Docket No. 60], be **DENIED**;

8. Defendant's Motion to Supress Electronic Surveillance Evidence, [Docket No. 61], be **DENIED**;

9. Defendant's Motion to Supress Physical Evidence, [Docket No. 62], be **DENIED**;

10. Defendant's Motion to Supress Electronic Surveillance Evidence, [Docket No. 63], be **DENIED**;

11. Defendant's Motion to Supress Physical Evidence, [Docket No. 64], be **DENIED**;

12. Defendant's Motion to Dismiss Indictment, [Docket No. 65], be **DENIED**; and

13. Defendant's Motion to Dismiss Indictment, [Docket No. 69], be **DENIED**.


Dated: January 15, 2021                                    s/Leo I. Brisbois
                                                           Hon. Leo I. Brisbois
                                                           U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.